We rise to the first case of the afternoon call, 2-09-155, David H., Dr., Sr. v. Lawrence Prindaville, Special Administrator, et al., and Matthew Hermes. On behalf of the Appalachians, Ms. Lynn Dowd. On behalf of Athlete Hermes, Mr. Richard A. Palmer. On behalf of Athlete Prindaville, Mr. Douglas E. Lee. All right, counsel is for the appellant. Is it warm in here? It is. I'm sorry, Justice, but the fans are the best if you do that. Good afternoon, Your Honors. For the record, my name is Lynn Dowd, counsel. May it please the court. I do represent the plaintiff appellant, David H., Dr., in this litigation, and in the time allowed, I'd like to focus my argument on one of the central issues of our case, which is the summary judgment and directed verdict entered against the defendant, Mr. Hermes, who was a realtor and broker at the relevant times. And as a preliminary remark, I'd like to give some context to our argument by way of addressing that it's our belief that we are seeking a complete reversal of the summary judgment ruling and the directed verdict, and as such, among the elements of damages would be the punitive damages. So Mr. Hermes, in his brief, is manifestly incorrect to try to assert that we've in any way waived our claim to seek punitive damages against him on remand. Coupled with that, in light of the Turner v. Firstar case that we've cited, Illinois law provides that the punitive damage awards entered among various defendants, here co-defendants, are separate and distinct, and that's a separate evaluation by the jury. So that alone, in light of the fact that there was a compensatory damage entered against the printables, has no bearing on our cause of action against Mr. Hermes. If the compensatory damage award were to work out to be the same or perhaps higher against Mr. Hermes, at best, he'd be intended to have set off under Illinois law. But the punitive damage elements of each of these causes of action is viable, and we have appeal from the complete judgment, the final judgment entered in this case. With that said, Your Honors, I'd like to just state, most succinctly, the elements of the various causes of action are not in dispute. The trial court did a very nice job articulating the various claims. The fundamental issue in dispute is essentially one, and it applies to all causes of action against Mr. Hermes. Namely, whether there is any evidence in this record, after this court applies its de novo review, to support sending this case to the jury with respect to the element of Mr. Hermes' knowledge of the decades-long dumping on the farm Mr. Doctor purchased and the subsequent landfill operations that were run on this farm. The fundamental error we submit, most respectfully, that the trial court committed in entering summary judgment and, accordingly, ultimately granting a directive verdict, is that it equated the concept of the reasonable inferences a jury may draw from the evidence we have in this record with the concept that that's the same as speculation and conjecture. And I submit under the thousands of summary judgment cases that discuss the standards of review, the PEDRC standard of review that my client is entitled to, what are reasonable inferences, that is just manifestly incorrect with respect to the trial court. And I know the court has read the record and the briefs carefully, but I'd just like to highlight some of this evidence in keeping in mind that we are entitled to prove our causes of action completely, if we so choose, based on circumstantial evidence. We can submit that circumstantial evidence to a jury and let the jury draw the reasonable inferences that we are entitled to argue in closing argument they should draw or that they draw on their own. And as this record shows, and we've tried to be as specific as we can, as we could, with citations to the record, the dumping went on for decades. This family, the Prudential family, had this farm since the Civil War era. But two dumps were disclosed, correct? Yes, sir. I mean, Harvey Evans was aware of the dumping that had taken place, and that was disclosed. In part, yes. And that's why we put the diagram in our brief, which, you know, I hope it's helpful, but basically the two dumps that were disclosed are in this area C, dumps number 1 and 4. And that's on page 4 of our brief, and it's also in the appendix. But the dumps that were not disclosed in area C were 2 and 3, the entire area B, area A, and then Mr. Doctor even testified that south of the farm there was another dump. And what all of, well, Mr. Doctor and, in his case, the chief, what the witness has testified to is that given the nature of excavation work and the nature of these dumps, which, keep in mind, contained entire fuel trucks were buried there, trucks that were half filled with tar, capacitors that contained PCBs, incinerators, an entire shoe factory was buried there. So when Mr. Doctor first met with me, I thought he was speaking in metaphors until I saw the photos and the evidence, an entire shoe factory. When you argue that dumping had been going on there for some time, I mean, maybe Hermes knew that, maybe he didn't, I don't know. But the fact that he did know that there were dump sites that were told to the buyer, there wouldn't have to be a play to that at all. Certainly he knew there was dumping going on there, and those were disclosed. So why does he need to investigate further? Because he was specifically asked by Mr. Doctor prior to purchasing the farm, prior to going to the contract, during the negotiations. Mr. Doctor's attorney, Tina Coffey, specifically asked, and so the law states that a realtor, when specifically asked under these various theories, cannot just turn a blind eye and say, go ask my client. Go ask the seller. He has a duty to go ask and investigate, and he testified that he did not. So one of our causes of action to keep in mind was not just fraudulent misrepresentation, fraud, but fraudulent concealment, which states simply is concealing a material fact that one has a duty to disclose. So again, bringing back to the essential issue for the jury, did Mr. Hermes know more than he claimed to know? Surely he acknowledged the two dumps, but we have evidence to show that he knew about a lot more. He knew about all of these dumps and said nothing. He testified, you know, through Mr. Prindaville's stipulated testimony, Mr. Hermes' testimony. He testified that he grew up on a farm. He worked on a farm. He worked on the Prindaville's farm from time to time. He visited them socially. He was their nephew, keep in mind, and he was very careful. He testified that around the ages of 10, 11, 12, 13, right around 1970, when the shoe factory and a lot of that dumping was going on, or in about those ages, which would take him right to that time period, that he was at this farm. The jury's entitled to draw some inferences that he was there. He was a young boy visiting the farm. I think that's a fair inference. Can a jury infer that he went to these ravines, that they explored them with his cousins? Some of his cousins were the invited parties, were some of the dumpees. They were allowed to. Is a jury supposed to just believe that they never discussed this? There was a fire. Is that all speculation? I mean, you're asking the law to draw a reasonable inference from an 11-year-old boy, or is that more speculation than it is asking to draw a reasonable inference, as the court said? Respectfully, no, Your Honor, but that's not the only evidence. Here's the evidence, and knowledge arises in cases every day. In the criminal cases, what's the knowledge? What's the intent? What's the conduct? That comes up every day in litigation, civil and criminal. And based on the facts, is this court prepared to say that for the jury to have to make, to draw that link between this evidence and does that prove knowledge, that's the ultimate issue in the case. That is for a trier of fact. But is it remote? I mean, isn't that a little remote? You know, Your Honor, we have a list of evidence. I mean, I think there's an abundance of evidence in this record, and perhaps one or two pieces of our evidence are subject to that analysis, but there's an abundance of other evidence that takes it beyond the remoteness. Namely, Mr. Hermes' adult experience when he became a realtor. He worked on farms. He managed farms. He specialized in farms. The Prindevilles told Mr. Hermes they never listed the farm to the open public for sale. They never, according to Larry Prindeville, they never offered it to their own children for sale. Larry found out it was sold at his father's funeral. That's his testimony. That's hard to believe. The Prindevilles did not want to, I mean, the reasonable inference is the Prindevilles did not want to sell this toxic dump, this landfill, to their own children. What they told Mr. Hermes, bring us an investor. They didn't say go see if any of the neighboring farmers want to buy our land. Get us an investor. Get us an outsider. Bring us someone who didn't know what was going on here. Mr. Hermes, you know, the other evidence. Let me just clarify which part of that is in the record now. They said what? They said, what's in the record? Everything I've delineated, yes. Well, well, well, well, every delineated, including get us an outsider that doesn't know what's going on. The specific evidence in the record is that the Prindevilles told Mr. Hermes to bring us, quote, an investor, close quote. What can the jury reasonably infer from that? As far as Mr. Hermes' knowledge, I think that goes to, it has the tendency to prove, and that's our burden under the civil burdens of proof. It has the tendency to show, to get us to build our case, to put all these links together, that Mr. Hermes knew that a local farmer, that, you know, people in the area wouldn't touch this toxic waste dump. Could you also infer that people in that area wouldn't pay what they wanted to make? That I'd get from an investor? Perhaps, Your Honor, but that's a matter for closing argument. That doesn't support summary judgment and a directed verdict. Keep in mind, this farm, there was a fire. The local fire department showed to put out a fire in the, you know, in part, a massive fire. Can a jury in the deliberative process ask, this had to be the talk of the town, this small town of Dixon. There was a fire. Everybody had to know there was a fire as a result of the dumping area catching on fire. I mean, this is the type of evidence that goes on and on and on that we have. And I submit respectfully that a jury, you know, perhaps we can chip away at one or two pieces of our evidence and, you know, in your opinion, I don't know what the court will say. But in any event, we've got the evidence to show we have a prima facie case to prove our element that Mr. Hermes had actual knowledge that there was decades-long activities of dumping and that this was a landfill. He knew it. We are entitled to let the jury decide that ultimate question of disputed fact. It's absolutely in dispute. How does the fact that he worked on other farms play into that? Well, I think one of the arguments that could be made, and I'm not suggesting necessarily it will be made, but I think it's pretty well known that farmers bury their garbage. Now, burying garbage might be a reasonable activity, but as far as, you know, Mr. Hermes, according to his testimony, I think his position was that he didn't know anything about this farm, that anything went on. He had no idea what his aunt and uncle were doing there with respect to burying any garbage or materials, and that's not credible. A lot of this goes to his credibility. It's not credible because people generally know that farmers bury garbage? Well, I think that might be a fair argument to make. But he could generally know farmers bury garbage and not know specifically that his aunt and uncle did. He could. I mean, what you just said is people generally know it, so you're telling me I know it. Again, if that goes to my point, perhaps that one piece of argument, standing alone, won't get us to a jury, but I think all of this evidence looked at individually or in combination should be deemed legally sufficient to take us to a jury. When do you have this, Mr. Hermes, at this farm? When he's a kid, which is back in 1970s, right? Oh, earlier than that. Since he was a young boy, he testified he went to this farm. I was kind of looking for more reason. From when he was a young boy through a teenager, he visited the farm, he worked the farm, through when he was an adult and became a realtor and was asked to sell this farm for his aunt and uncle. They didn't go to an outside realtor. No, no, I understand that, but you've got him as a teenager. You say he's working at the farm, and now we've jumped ahead to where he's a realtor. He's asked to, quote, find an investor. From the time he's a teenager until he's a realtor, do you have him at the farm? Yes. Okay. Yes. How often? What circumstances? His own testimony, but it goes even prior to being a teenager. He went out there several times a year. He worked for his family. Well, I mean post-teenager. Okay, post-teenager. Between teenage years and the year that the time when he's asked to sell. Well, and I know the court hates this answer. I have to check it, but the relevant dumping, the significant dumping, the biggest, was right around the 1970s, and those were his teenage years. Okay. I mean, we can connect him to the shoe factory dumping. You know, debris from entire schools that was being demolished was dumped on this farm from the area. And then it was all buried, so it wasn't visible later on after that? Correct. Yeah, two feet in the area, see, two feet of soil was put over it. The other was in a ravine. Well, actually, I take that back. With respect to areas one and four that were disclosed, that's because the doctors, when they went out and actually viewed the farm, saw some garbage and debris. They saw some rusty stuff and said, what's that? I mean, I think Mrs. Docter maybe even seen an appliance or two. And so that's when they disclosed those areas. But keep in mind, they never came clean over the course of this 10-year litigation. As the excavation and cleanup work is being performed, more and more is coming to the surface. As there's rains in this area, it's bringing up stuff. Excavation had to stop. So it's only what the doctors and their excavation team found over time that that's how they discovered this and that's how it unfolded. They never came clean. So you're submitting that it was a genuine issue, a fact, that a trial fact shouldn't have been decided at the summary judgment? That's the essence of our appeal against Mr. Herman, Your Honor. That's correct. And what was the specific damage that was asked for from the trial? Okay. At trial, with respect to the compensatories, $153,000 was requested. $150,000 in punitives was requested as to the printables. And as the court's aware, $125,000 was awarded in compensatories and $5,000 as to each of the individual printables being about 4% of the net compensatory award. So on compensables, you asked for $153,000. Do you have $125,000? Correct. Okay. And then on the punitives, it was significant? Yes. We asked for $150,000 and received $10,000. Very good. You'll have time in rebuttal then. Thank you very much, Your Honors, for your attention. Appreciate it. Good afternoon, Your Honors. My name is Douglas Lee, and I represent Lawrence Printable in this appeal. And with me at counsel table is Richard Palmer, who represents Mr. Hermas. We've agreed to try and allocate our time equally. Okay. This case, at least from the printables perspective, is the rare case of a SOAR winner. As a result of a jury verdict and the trial court's awards in this case, Mr. Docter has received almost a quarter of a million dollars from the printables. And yet, here we are on his appeal, because he's unhappy that the jury and Judge Pemberton didn't give him all of the compensatory damages he sought, that Judge Pemberton didn't give him all of the attorney's fees he sought, and that Judge Pemberton rejected his request for prejudgment interest. One thing Mr. Docter can't claim is that he was denied his day in court. He filed this case in November 1999 and was tried in October 2007. He thus had almost eight years to conduct discovery, gather evidence, and file motions. The printables made, and he rejected, five settlement offers, at least one of which would have produced a net result even better than he obtained at trial. Is that in the record? Yes, Your Honor, it is. Extensively. How did these settlement offers get in the record? They came up as part of Judge Pemberton's consideration of the fee request. Okay. The case was tried on Mr. Docter's sixth amended complaint. He had a seven-day jury trial, a simultaneous bench trial, and considerable post-trial proceedings relating to his claims for fees, costs, and prejudgment interest. The evidence and the law support the jury's verdict in Judge Pemberton's words, and no basis exists for this court to reverse those. We set forth in our brief the primary reasons we believe that the trial court's ruling should be affirmed, and I'll do my best not to repeat those here. I would, however, like to respond to some of the arguments that Ms. Dowd raised in her reply and, of course, answer any questions the court has. As to the issue of the Nordman invoice, which is one of the arguments made against the printed bills, Ms. Dowd in her brief, I think, disingenuously suggests that Judge Pemberton could have considered the invoice as opposed to the estimate as part of his ruling on the consumer fraud case. And she says that's possible because he didn't make his award on that column until April of 2008. What she neglects to tell the court, however, and it's just clear in the record, is that Judge Pemberton announced his ruling on that claim on January 17, 2008, not long after the parties submitted their written arguments on that issue. So, contrary to the implication that's suggested, there was not an extended period of time between the introduction of the evidence and Judge Pemberton's ruling. Second, Mr. Docter suggests that the October 11, 2007, on the eve of trial, deposition of Mr. Nordman somehow could cure any prejudice to the printed bills. Now, in her reply, after correctly noting that, of course, the deposition isn't in the record, Ms. Dowd assures the court that I would not contradict that Mr. Nordman was deposed concerning the invoice. Well, I would contradict that. I won't contradict that the invoice came up, but I would certainly contradict that the invoice was at all the purpose of that deposition. That deposition was ordered by Judge Pemberton based on objections the defense counsel made to Mr. Nordman's testimony concerning his final parts of the claim. And what Judge Pemberton said was, I'll allow him to testify concerning the work he did, and I'll allow the estimate to come in, which was timely disclosed. But Judge Pemberton drew the line on allowing Mr. Docter to submit an invoice that came in more than a month after the court's deadline for disclosing his damages. Now, if I could just turn briefly to the issue of prejudgment interest. Mr. Docter wants to make much of the standard of review. I think both sides agree that a number of appellate courts have held that prejudgment interest is allowable under the Interest Act only if the damages are liquidated or easily ascertainable. Mr. Docter claims that limitation isn't set forth in the statute. I can agree, I agree that those words aren't in the statute, but I'm also not aware of any appellate court decision overruling the rulings of those other appellate courts. Other appellate courts have imposed that limitation, and therefore it certainly can't be error for Judge Pemberton to have done the same. To a certain extent, however, Mr. Docter's standard of review and law versus equity arguments are read hearings. Even if the standard were, as Mr. Docter argues, or even if this case would somehow be deemed to have sounded in equity, prejudgment interest would not be allowed because there was no vexatious or unreasonable denial of payment. The case law is clear that merely defending a case is not in and of itself vexatious or unreasonable. In this case, the printer does not only defend the case, they defended it successfully. They resisted Mr. Docter's efforts to recover all of the compensatory damages he sought, and perhaps more significantly, they successfully resisted his effort to get $102,000 in punitive damages. Can this be seen as two arguments, though? Can you theoretically say that there was not an unreasonable or vexatious delay, and therefore I'm not going to award interest under the Interest Act? Bob, if I find this is an action in equity, I can still award interest. Well, certainly within the court's discretion, but I think the case law is pretty clear, at least as I read it, that if you're going down the ethical road, you also need to consider whether there's an unreasonable or vexatious delay. And that's the whole purpose to penalize, perhaps, the defendant or to compensate the plaintiff if the defendant basically is creating an obstacle to payment. They seem to be arguing the alternative in some of the briefs, so I'm just curious as to how they come about together. Well, again, Mr. Docter is raising the alternative first under the Interest Act and then under the equitable considerations. Our point is we understand the distinction, but it doesn't matter because we think it ends in the same place, and that is no matter which road you go down, you get to the intersection of were the printer bills vexatious or unreasonable in their defense of the case. And I don't see how you could say that they were when the verdict that resulted from their defense was $170,000 less than the verdict he asked for. So for all those reasons, Mr. Prindle, I respectfully request that the court affirm the rulings of the trial court. Thank you, counsel. Thank you. Counsel. Good afternoon, Your Honors. May it please the court, counsel. I'm Richard Palmer, and I represent Matthew Hermes. I want to start my remarks with the first point I made in our briefing, and that is mootness. But by doing that, don't detract in any way from going straight on and refuting much of what was said here today by Mr. Docter's counsel with respect to Hermes' knowledge and drawing inferences from circumstantial evidence, and I will get to that. But I think this court should and could end the appeal with respect to Mr. Hermes on the basis that that appeal is moot. I'm pleased to have this opportunity for oral argument because our motion to supplement the record was denied. I think there is no dispute that Mr. Docter has been paid all of the compensatory damages awarded to him by the jury. Indeed, he's been paid all of the damages, attorney's fees, compensatory damages, punitive damages, and costs. A review of the record will show that the compensatory damages that he sought from the jury against the Prendervilles are exactly the same as he sought against the Hermes. In fact, if anything, what he sought against the Hermes was a little bit less because there was minor issues with roof leaks and other complaints that he had that there's no contention Hermes would be responsible for those. So what he sought against the Hermes was in addition to what he sought against the Prendervilles. Not with respect to compensatory damages. He wanted the exact same clean-up damages, clean this place up, and what it's going to cost me to get an NFR letter. Those compensatory damages are exactly the same. And he's not been paid all of those. He's not filed a satisfaction of judgment. Is that stuff that you wanted to supplement the record with that we said no? I asked for the record to be supplemented with an affidavit of Larry Prenderville that said he had paid all of these judgments. Since then, it's my understanding, although this is not a judgment against my client, that a request for a satisfaction of judgment be filed by Mr. Doctor. He has failed to refuse to do so. A motion was filed with the trial court asking that he be ordered to do so, and it is his contention that the trial court lacks jurisdiction. That's my understanding on that. But when counsel gets up for reply, I would invite this court to seek clarification on whether he has indeed been paid all of his compensatory damages. What about the punitive damages? Okay. I want to address the punitive damage issue. I don't disagree with what counsel says in their reply brief, that the punitive damages could be assessed separately and, in fact, should be assessed separately. What I would say on that point, however, is that first you would have to reinstate the actual fraud counts. And more importantly, we submit that Mr. Doctor has waived that. He did not challenge the trial court's ruling on the punitive damages, saying that he could not seek them against Hermanns. Now, counsel has suggested that I appeal the final judgment, and hopefully that's broad enough and will save me. But, in fact, the punitive damage that was a separate evidentiary hearing, Mr. Doctor had opportunity to present whatever evidence he wanted that might support a reasonable likelihood of being awarded punitive damages at time of trial, and the trial court found that he had failed to do so. That order was entered, and it was not appealed. And I think this court can, if it chooses, deem that to be a waiver. I recognize it's not a limitation on the jurisdiction of the court, but I think it could be a waiver. So for all of those reasons, if this court were inclined to send the case back to the trial court on the case against Mr. Hermanns, what would we have? A jury trial on all of the conduct and compensatory damages? The amount that the jury determined for compensatory damages, he didn't even, Mr. Doctor didn't even challenge that. He's only asking for a new trial, new bench trial. That's a little confusing sometimes in the arguments, but I looked at his conclusion again in his initial brief, and he asked only for a new trial as to print those on the bench trial portion. So I think that could and should be. We submit the end of the appeal with respect to Hermanns. However, I'm going to spend my remaining time addressing the propriety of Judge Pemberton's rulings on motion for summary judgment and the directive verdict. We submit it's clear that they were correct. If there's nothing else that's apparent from this record is that Judge Pemberton was nothing, if not certainly very deliberate, very thorough and very thoughtful at all of the rulings and hearings over almost eight years, nine years that this court ended in his courtroom. With respect to the motion for summary judgment, an element of the three counts on which he granted summary judgment was actual knowledge. That's a necessary element. At the summary judgment stage, the plaintiff has the burden to come forth with some evidence in order to survive that motion for summary judgment. In their brief, they concede there's no direct evidence, but their argument here is there is circumstantial evidence from which inferences could be drawn, and they ask this court to draw those inferences. Judge Pemberton was not willing to draw those inferences. I find it interesting that the case that Mr. Doctor primarily relies on, Nowak v. Coghill, decision from this court, affirmed a summary judgment for the defendant, finding that that circumstantial evidence had fallen into the remoteness, speculation, imagination category. And we submit that's exactly what we have here. I think Justice Burke was on point with his first question to say that knowledge of dumping, even if there was an inference that could be made of knowledge of dumping, does not equate to knowledge of undisclosed dump sites. And that's because two dump sites were disclosed. They were described by Mr. Doctor and by his wife as being fairly large sites with appliances in them, household debris. It was apparent to anybody who stood there and looked at that that dumping had been going on in the site. So for them to say, well, draw an inference that Mr. Hermes knew there was some dumping, that maybe his cousin had taken over some household debris or whatever, does not equate in any way to knowledge of other undisclosed dump sites. It really maybe doesn't come to life through the briefs, but the central issue in this case with respect to nondisclosure was this shoe factory debris area, the ravine. I mean, that's really what this case was all about. Two were disclosed. These others were smaller sites with some concrete to stop erosion, types of things that farmers did in the 40s, 50s, 60s, whether they should have been doing them or not. Which site had the big trucks with the tire in them? I think it was only one truck, and that would have been a truck at least that was older than dirt, and it was in the ravine. She said there was a truck half full of fuel, a fuel truck, and then a truck that was half filled with tires. I don't believe the record will support that there was a truck half full of tar. I think there was a tar wagon that was empty. My time is up. You can go ahead. I've never seen the first lawyer in a splitting time that didn't reach the contract anyway, so you can go ahead. Thank you, Your Honor. With respect to this becoming speculative, the first point is that knowledge of dumping does not equal knowledge of undisclosed site. The second point is the timing, which this court had some questions about, too. The only thing in the evidence with respect to timing is that Matt Hermes was on this place as a youth, and he said he was there perhaps baling hay one or two times per year at most, maybe some years not at all, until he was 10, 11, 12, 13. That's the testimony in the record. He wouldn't have been 14 until 1970. The ravine was filled up sometime in the early 70s. So you have to make a giant leap there in terms of time-wise, plus the fact that it was covered up with dirt. And that wasn't for a sinister reason. That was because Ray Prindleville thought covering this ravine up made it a better farm. And we can all say that was a gross error in judgment. But at that time, filling up a ravine, preventing erosion, and then growing corn on it for 25-plus years, in his opinion, made it a better farm. And that's what his testimony was. Some of these other arguments that they put forth, I think, show the desperation, the fact that Matt Hermes lived 8.7 miles. He was south of town. The Prindleville farm was north of town. This business about where he went to school, well, he never even would have gone past the Prindleville farm. There's no evidence that he was there in his teenage years beyond 13 years old. They had seven, eight years to go get that evidence. Other family members, what social events, what farm. It's just not there. And that's why this becomes terrible. Their argument seemed to be, excuse my interruption there, that the whole community out there would have known this was a dump. It was just common knowledge, and anybody growing up there would have known it. He might have had a little more of a possibility because he's a family member. But she seemed to argue with us that everybody knew this was the community dumping area. And then you had in the fire, you had to call the fire department out to put a fire out in this dump and all that. Everybody would have known this. The problem is there's no evidence of record. I respectfully submit there's no evidence of record to support that. Nobody that came into court or even in depositions said it was commonly known that this was a dump site. I don't know when the fire was, but it was in the 40s, 50s. I don't think that was ever established in the record. So that's, you know, what it makes for fanciful imagination, or that my client roamed the farm when he was 10 or 12. What about the suggestions you had there that Mr. Hermes was instructed to find an investor as opposed to being told market to anybody? I mean, logically, you would think you'd let neighbors know that the farm was for sale. You wouldn't. You know, the way this rolled out was that Mr. Hermes was really only involved with this transaction from about the 1st of January until the 7th of January. He took Mr. Doctor and his wife to a different farm, or to First, when they had inquired about the possibility of purchasing a farm. They weren't interested in the farm. They were initially chosen. And so the testimony is that Matt Hermes knew that his uncle, Mr. Prineville, was getting ready to retire. He had made that known. And that if he could sell on contract, which is what he wanted, because he wanted the tax advantages of doing that, that that would be his preference. So at the time that they were first showing doctors the farm, Matt Hermes contacted his aunt and uncle and said, would it be okay if I brought these folks by? He did not have a listing agreement at that time. He did later. After they had reached an agreement in principle, he had a listing agreement executed between he and the Prinevilles. But my question was, is there testimony to support what she said, that the farmers told their nephew, find us an investor? I don't recall that testimony. But I can't say, stand here before the court at this point and say that it's not there. I don't know. All right. Go ahead and wrap up if you would. The other point I want to make on the summary judgment motion, the case has shifted considerably from what happened in the trial court to what's happening here. The main argument here is circumstantial evidence. Please find enough circumstantial evidence to get us past the motion for summary judgment. Don't characterize it as speculation or conjecture. What you will see is that their attack against Matt Hermes was that he had made an affirmative misrepresentation that there were no dumps. And they attributed that evidence to Tina Coffey. And then when Tina Coffey's deposition was taken in which she said, no, that's not what he said to me, that's when they were persisting with all of their arguments in the trial court. Matt Hermes made an affirmative misrepresentation in this statement of fact. It wasn't all of this business with the circumstantial evidence. I'll just finish real quickly with the directive verdict part. Obviously, I think counsel conceded this point that Judge Pemberton applied the appropriate legal standards from the Harkala and the Lyons case. And it's clear that Mr. Hermes, as the seller's attorney, has no obligation to the buyers unless he knows what the buyers told, unless he knows what the sellers said was false or has knowledge of facts that would lead him to reasonably believe that what he said was false. And Matt Hermes was present on January the 7th. Ray Pringleville was there. David Docter was there. Nancy Docter was there. The matter of other dumps was expressly stated. There's no – or expressly inquired about, you know, are there any other dumps. Ray Pringleville said no. There's no reason to believe that he would have said anything different to Matt Hermes or to Tina Coffey. She made the inquiry or to Gary Elwok as far as that's concerned. Everybody agrees that Ray Pringleville was a credible person. And he said he just forgot. There's no reason to believe that he would have said anything different. And Mr. Docter had his opportunity to get his answer directly from Mr. Pringleville, and he did. Thank you. Okay. Thank you, counsel. Now for rebuttal, Ms. Galbraith. Thank you, Your Honors. I'll try to be brief. I'm going to cover about four or five points, if I may. First of all, as the court knows, before the court being summary judgment and directed verdict, it's a de novo review. The correctness of the court's judgment based on the entire record, not its reasons, are at issue. Second, with regard to jurisdiction and this order that's on page 88 of our appendix, December 2006, that deals with the 604.1 hearing on punitives, that hearing was had only with respect to the surviving count, the negligent misrepresentation count. Now, keep in mind by that point the case was gutted as far as being even able to go after Mr. Hermey's knowledge. Summary judgment was already entered on all the fraudulent counts. The court determined as a matter of law that we could not prove Mr. Hermey's knowledge of the dumping activities on the farm ever, that he didn't know there was one piece of debris, one piece of metal in the ravine. So we never got to that point. In paragraph six of our notice of appeal, we- Don't you have to prove actual knowledge in a fraud? Not in all of our elements. Not in all of our causes of action, Your Honor. With the negligent misrepresentation, the fraudulent concealment. Again, the fraudulent concealment, he had a duty to disclose material facts. And keep in mind, Your Honors, this is a very important point. Aside from his knowledge- But in order for him to have a duty to disclose, you have to prove that he had knowledge. We would like to. That, yes, we would like to prove he had knowledge. We think we can. We think we can persuade a jury that based on these facts and Mr. Hermey's connection with this farm, that he testified, I knew the farm, that he was the nephew, that his cousins, we've got a list of everybody who was invited to participate in the dumps. Ed Fritz, the Printerville's nephew, Mr. Hermey's cousin. Jerry Carlson, the Printerville's son-in-law. Larry, their son. They all dumped. This was a family dump. We can argue that to the jury. Did they say whether they dumped at the disclosed sites or the non-disclosed sites? All these folks that said they dumped it. I do not believe, Your Honor, that the testimony was limited to them saying they dumped in the disclosed sites. And, in fact, with respect to the public invitees, again, Bob Lee, the local roofer, you know, this went to the other areas that were not disclosed. Joe Pettinger, Bob Crophy. The others, Mr. Printerville said, you know, there were so many you couldn't remember who they were. The Monaghan Construction Company from Chicago brought their plaster from school buildings out there. Tom Weigel, the shoe factory. Again, this was an ongoing, active, aggressive landfill and dump. And this is for the jury to decide that Mr. Hermes, during this relevant period, was he there once? That's our prima facie burden. Can we prove that he was there once when these dumping activities, especially with the trucks cleaning, you know, dumping in the shoe factory, that was going on all summer? The trucks were coming and going. That was an activity. That was not isolated. It was not under the darkness of night.  I submit we're entitled to take that to a jury. But also, Your Honor, another duty that cannot be overlooked, and this should go to a jury, is that when Mr. Hermes was expressly asked by the Printervilles to go find out if there's any other dumps, that is not predicated on his knowledge. As the realtor, he had a duty to go ask them. He couldn't turn a blind eye. By the doctors. By the doctors. Thank you. I'm sorry. Yes, the doctors asked Mr. Hermes to go do this. He testified. When asked, he did not do it. He breached a duty he had to the doctors as potential buyers. And the case law says at that point the realtor owes the duty to the public. When is that in time in connection with the conversation that took place between the buyers, the sellers, and Hermes that was there? From when they viewed the farm until they signed the contract. It was in the first three weeks of January. You said he was specifically asked. During that period. Let me fix this. There was an argument before that there was a conversation where the doctors asked the farmers directly. Hermes was there. You're saying on another occasion they asked Hermes. Yes. Was that before or after that or when? After. And let me make a couple points with respect to that, Your Honor. When the Printervilles were looking at this farm. Excuse me. I'm sorry I mixed them up. When the doctors were looking at this farm, the Printervilles never said, hey, by the way, in areas one and four we did some dumping. They never, ever disclosed this dumping. It's only when the doctors went out there and actually saw it and they saw some debris in areas one and four. They asked the Printervilles and then they said, oh, yeah, yeah, we did a little bit of dumping. Knowing they had all this. Keep in mind, they were adjudicated to have committed fraud on the doctors and had been guilty of willful and wanton misconduct. Because of that, the doctors asked Mr. Hermes directly. And again, the attorney went back and asked for him to go ask his aunt and uncle, is there anything else? And he testified, yes, they asked me and I didn't do it. That is a breach of his obligation. And that is not, he doesn't have anything to do with his lifelong knowledge around this farm. That should take us to a jury. What, did they ask him why haven't you got back to an answer with us? I don't believe that question is in the record. His response was, wasn't it, you'd like to ask my aunt and uncle, isn't it? What was his response when the doctors, Mr. Hermes' response when the doctors said. At one point he did say, go ask my aunt and uncle. But the Illinois law says that when a realtor is specifically asked to find out information, they can't just pass it off on the seller. But that's not, because again, Illinois law is all about preventing fraud. People should be free to buy real estate, farms, commercial property, and it's not a buyer beware state. There's duties to disclose. And my clients were damaged because of this. Finally, Your Honors, just with respect to Mr. Lee bringing up the settlement offers, that's completely improper. I know the court knows that, but there's nothing in the record to say that there was ever a settlement offer better than the judgment that was entered in this case. And quite frankly, the five settlement conferences they talk about only as my clients discovered more and more landfills to the print. They'll say, okay, okay, they found this out. We'll give them a little more. Oh, okay, they found another one. Unless you have any other questions, thank you very much. Let me ask you a question. The compensatory damages issue. I mean, haven't you recovered? I mean, the jury's given you a compensatory damage. Are you entitled to additional compensatory damages, do you think, from Mr. Hermes? Yes, sir. And that all relates to the trial court's ruling with respect to Mr. Norman's last invoice. I mean, there was a time period between. Remember, this dumping, my clients are still finding things today, but that's not in the record. I apologize for even saying that. With respect to this record, by the time they went to trial, the court had a discovery cutoff date. And it was right around August of that prior to trial. The seeding, given the natural issues with respect to a farm, seeding can't be performed in August prior to the discovery cutoff date because of the rains. And it's always done in the fall is my understanding. I've learned a lot about farming, and that's what happened here. So the actual $25,000 seeding efforts over this area, that was the last invoice, and the court had a discovery cutoff date with respect to the jury trial, but that's part of our brief where we submit with respect to the bench trial. There was no reason the court didn't allow the admission of that evidence. And the additional, it actually totals up to about $52,000 more in compensatory damages. You know, counsel is permitted to take a deposition. The whole idea is disclosure. By the time we got to the bench trial, that evidence was there. The court denied that. So quite frankly, if we go back, I submit my client should be entitled to put on this full compensatory case, and certainly a punitive damage case. Okay. Thank you, everyone, for their arguments. You're going to be taken under advisory.